UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

JOHNNY JAVIER CUSME LOPEZ

Defendant

---

16 CR 617 (VEC)

# SENTENCING MEMORANDUM
# FOR JOHNNY JAVIER CUSME LOPEZ

Deborah Colson
COLSON LAW PLLC
80 Broad Street, 19th Floor
New York, NY 10004
(212) 257-6455
*Attorney for Johnny Javier Cusme Lopez*

Dated:  New York, New York
        April 28, 2017

# I.

## INTRODUCTION

Mr. Cusme pled guilty in November 2016 to conspiracy to distribute cocaine while onboard a vessel subject to the jurisdiction of the United States. He is scheduled to be sentenced on May 10, 2017. Based on a total offense level of 27 and a criminal history category of I, the Probation Department estimates an advisory guidelines range of 70-87 months. Should the Court grant a two-level reduction pursuant to § 2D1.1(b)(16), Mr. Cusme's total offense level will be 25, and his advisory guidelines range will be 57-71 months.

A guidelines sentence is significantly "greater than necessary to comply with the purposes" of sentencing articulated in 18 U.S.C. § 3553(a). This was Mr. Cusme's first arrest. He played a minimal role in the overall conspiracy and took part under partial duress. He also suffers from serious health problems related to a prior head injury. In December 2017, Mr. Cusme underwent brain surgery at Kingsbrook Jewish Medical Center to remove a benign tumor. He continues to experience side effects of the surgery, including pulsations in the right side of his head and difficulty sleeping.

Attached in support of this application are: a letter from Mr. Cusme (Ex. A), excerpts from the Coast Guard detainee log (Ex. B), and excerpts from medical records provided by Kingsbrook Jewish Medical Center (Ex. C).

# II.

## MR. CUSME'S PERSONAL HISTORY AND CHARACTERISTICS

Mr. Cusme, age 26, was raised in Anconcito, Ecuador, *see* PSR ¶ 40, a small town in the Province of Santa Elena on the outermost peninsula of the country. Anconcito is just fifteen kilometers south of Salinas, a popular tourist destination, but the town is unheard of by most

tourists. The local economy is entirely dependent on the fishing industry and vulnerable to changes in weather patterns and consumer demand. The recent immigration of fisherman from other coastal regions of Ecuador has created a major strain on the town's limited infrastructure and economy.

Like most others in Anconcito, the Cusme family makes its living through commercial fishing. The youngest of seven siblings, Mr. Cusme began fishing with his father and older brothers when he was ten, helping to set up the boat and prepare the equipment. (PSR ¶ 41.) By the seventh grade, Mr. Cusme had learned all aspects of the trade, and he left school to fish full time. When Mr. Cusme was sixteen, his mother went blind, and he began helping with the cooking and cleaning too. (*Id.*) Though Mr. Cusme worked hard, he describes a happy childhood with plenty of free time to play outdoors with his siblings and friends.

The turning point in Mr. Cusme's life came one month shy of his eighteenth birthday. One night on the way home from a party, Mr. Cusme was in a serious car accident that left him near death. (PSR ¶ 45.) Over the next ninth months, Mr. Cusme was shuttled between hospitals and rehabilitation centers and had several surgeries to his face and jaw. (*Id.*) Since that time, he has suffered from a severe seizure disorder. (*Id.* at ¶ 46.) He also has impaired vision in both eyes.

Mr. Cusme's surgeries were expensive, and they depleted the family's savings. Upon his recovery, Mr. Cusme tried fishing again, but following several seizures at sea, his family and neighbors grew increasingly reluctant to include him on overnight trips. Then, in 2013 or 2014, Mr. Cusme's mother and father both died of heart attacks within a six-month period. (PSR ¶ 39.) By this point, Mr. Cusme had two children of his own to support, and over the next several years, he went on to have two more. (*Id.* at ¶ 42.)

Following his parents' deaths, Mr. Cusme's lack of employment caused mounting tension with his siblings and the mothers of his children. Mr. Cusme moved into his parents' old home to save costs. But during the summer of 2016, his older siblings decided to sell the home, leaving Mr. Cusme homeless. Untethered and desperate for work, Mr. Cusme traveled to the city of Manta to live with a cousin and look for a job. His search for employment in Manta is what led him to the offense conduct described below.

### III.

### NATURE AND CIRCUMSTANCES OF THE OFFENSE

Some weeks after his arrival in Manta, Mr. Cusme took a day trip to San Mateo where he ran into an old friend. The friend introduced Mr. Cusme to a man named El Rabo, who hired Mr. Cusme to join his fishing crew. At the time, Mr. Cusme believed El Rabo owned a legitimate fishing business, and he was relieved to find work.

The day after their initial meeting, El Rabo drove Mr. Cusme and co-defendant Nelson Antonio Ortiz Vite to Esmeraldas, another fishing town eight hours north of San Mateo. From there, the three men boarded a small motor boat and rode twenty-five to thirty minutes out to sea. When Mr. Cusme asked El Rabo where they were headed, he was told to calm down. Eventually, a second boat came into view, filled with unidentifiable materials covered by cloth. When Mr. Cusme refused to board the boat, El Rabo threatened to harm Mr. Cusme's family. El Rabo also promised to pay for cosmetic surgery to fix the scar on Mr. Cusme's face if he agreed to take the trip. Terrified of what might happen if he continued to resist, Mr. Cusme boarded the boat.

The following morning, Mr. Cusme examined the materials under the cloth and discovered the drugs. Two days later, a supply boat approached and provided Mr. Cusme and his co-defendants with additional gasoline and food. The crew warned the defendants that the Coast

Guard had been spotted in the area. Minutes later, a Coast Guard boat appeared, and all three defendants were arrested.

Following their arrest, the Coast Guard held Ms. Cusme and his co-defendants at sea for twenty-seven days before transferring them to this district on August 27, 2016. The men were shackled to the decks where they were exposed to wind, rain, and sun. They were not given regular showers and, on some days, they received just two small meals. On the twelfth day at sea, Mr. Cusme experienced a seizure, during which he had convulsions and expelled blood from his mouth. (Ex. B.) The officers on board described his appearance following the seizure as "dazed," "weak," and "tired." (*Id.*) They discussed the seizure with flight systems but did not take Mr. Cusme to a hospital. (*Id.*) After the seizure, Mr. Cusme was held on the boats for an additional two weeks before arriving on dry land.

### IV.

### A CONSIDERATION OF THE SENTENCING FACTORS WARRANTS LENIENCY

Section 3553(a) of title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This provision, known as the parsimony clause, applies at every federal sentencing "except as otherwise specifically provided." 18 U.S.C. § 3551(a). Indeed, the command of the parsimony clause defines this Court's "overarching duty." *Pepper v. United States*, 131 S.Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal

conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper,* 131 S.Ct. at 1240 (quoting *Koon v. United* States, 518 U.S. 81, 113 (1996)). While the guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States,* 128 S.Ct. 586, 596-97 (2007). Rather, the judge is directed to make an "individualized assessment" of the sentence warranted "based on the facts presented." *Id*. at 597.

Two factors warrant leniency here.

1. The advisory guidelines overstate Mr. Cusme's culpability

First, the advisory guidelines overstate Mr. Cusme's culpability. Many courts and commentators have noted that, in writing the federal sentencing guidelines, the Sentencing Commission fashioned sentencing ranges for drug offenses that are proportional to the mandatory minimum sentences established by Congress. *See, e.g., United States v. Diaz,* No. 11 Cr. 821, 2012 WL 322243, at *1 (E.D.N.Y. Jan. 28, 2013); *United States v. Vasquez,* No. 09 Cr. 259, 2010 WL 1257359, at *2 (E.D.N.Y. March 30, 2010). In so doing, the Commission failed to engage in any significant empirical analysis or research, nor did it explain how its scheme furthered the purposes of sentencing articulated in 18 USC § 3553(a). *See United States v. Thomas,* 595 F.Supp. 2d 949, 952 (E.D. Wisc. Jan. 24, 2009). It simply followed Congress' lead in emphasizing drug quantity over all other relevant sentencing factors, including an individual defendant's role in the offense.

Drug quantity may serve as an accurate measure of culpability for drug kingpins and masterminds. But it grossly over-estimates the culpability of low-level traffickers like Mr. Cusme. *See United States v. Jaber,* 362 F.Supp.2d 365, 380 (D. Mass. March 16, 2005) ("[d]rug quantity may well be a kind of accident, depending on the fortuities of law enforcement or even the market, as much as it reflects the defendant's culpability.") Mr. Cusme played a minimal role in the instant offense. He had no prior relationship with the drug enterprise, no proprietary interest in the drugs, and no control over the type or quantity of narcotics on the boat. *Cf. Diaz*, 2012 WL 322243, at *12 (noting that "[t]he courier is unlikely to know if the suitcases contains 1,000 grams or 10,000 grams of a drug, or if it contains heroin, cocaine or crack.")

Because Mr. Cusme's go-fast had approximately 680 kilos of cocaine, his base offense level is 34, which is higher than the base offense levels for involuntary manslaughter (levels 12 - 22), aggravated assault (level 14), robbery (level 20), extortion (level 18), and many other violent and non-violent offenses. The government has awarded him a four-level minimal role reduction. However, in light of the guidelines' heavy reliance on weight, even that reduction is insufficient to take into account Mr. Cusme's lesser role in the offense. *See Diaz,* 2013 WL 322243, at *7 (describing mitigating role adjustments as "nibbl[ing] around the edges of a sentencing framework myopically focused on drug weight and unreasonably moored to mandatory minimums intended for high-level drug traffickers. They mitigate sentences slightly but still leave low-level offenders facing prison terms suitable for a drug boss"); Justice Stephen Breyer, *Federal Sentencing Guidelines Revisisted,* 11 Fed. Sent. R. 180, 1999 WL 730985, at*11 (Jan./Feb. 1999) (arguing that the scope of the role adjustment should be broadened). Moreover, unless the Court awards him a two-level reduction pursuant to § 2D1.1(b)(16), the advisory

guidelines also fail to account for the threats and fear Mr. Cusme experienced prior to boarding the boat.

Accordingly, we respectfully request that the Court grant Mr. Cusme an additional downward variance in recognition of his minimal role. Other courts have granted similar departures, even where a role reduction has already been applied. *See, e.g., Thomas,* 595 F.Supp. 2d at 952 (downward variance in drug case where minor role reduction was insufficient to take into account defendant's lesser role in the offense); *United States v. Cabrera,* 567 F.Supp.2d 271, 278 (D. Mass. July 25, 2008) (minimal role reduction in drug case and finding even that adjustment inadequate to address the purposes of sentencing); *Jaber,* 362 F.Supp.2d at 380 (variance for low-level drug dealer who did not intend to distribute a particular amount of drugs). Such a reduction is particularly appropriate here where Mr. Cusme's decision to participate was at least the partial result of threats and the safety valve does not apply.

2. Medical problems

Second, the need for punishment should be weighed against the impact a lengthy sentence may have on Mr. Cusme's health. *See* U.S.S.G. § 5H1.4 ("Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted.") Mr. Cusme suffers from serious and ongoing health problems that make daily life in prison more difficult for him than the average prisoner. In December 2017, Mr. Cusme underwent surgery at Kingsbrook Jewish Medical Center to remove a benign brain tumor. (Ex. C.) The surgery followed several seizures at the MDC, during one of which he fell from his bed and injured his shoulder. After the surgery, Mr. Cusme spent several weeks in a rehabilitation unit at the hospital regaining lost cognitive and motor function. (*Id.*) Since his return to the MDC, Mr. Cusme has experienced trouble sleeping and pulsations along the left side of his head.

Even assuming he continues to receive adequate medical care in prison, he lives in fear of another seizure and another fall. Mr. Cusme's plea agreement prohibits him from requesting a downward departure under § 5H1.4. Nonetheless, his health problems merit leniency under § 3553.

## V.

## CONCLUSION

For the above reasons, we respectfully request a significant variance from the advisory guidelines range.

New York, N.Y.
April 28, 2017

/s/
_____
Deborah Colson
Colson Law PLLC
80 Broad Street, 19th Floor
New York, N.Y. 10007
(212) 257-6455